## J. E. Hayner & Co. v. J. A. McIlwain et al.

1. VENDOR AND VENDEE—*Duty of Vendee to Inform Vendor.*—The law does not require a purchaser to inform himself fully, in order that he may apprise the vendor of the condition or value of the property to be sold, and failing to do this, occupy a like position as if he had made false representations touching the same.

2. SALES—*Contract Not Vitiated by Mere Misrepresentation.*—A contract is not vitiated by a mere misrepresentation by the buyer of his motives in purchasing or limiting the amount of his offer, for these are not representations on which a person can reasonably rely.

3. FRAUD—*Property Obtained by.*—Property obtained by one, through the fraudulent practices of a third person, will be held under a constructive trust for the person defrauded, though the person receiving the benefit is innocent of collusion. But this principle can not prevail against a purchaser in good faith for a valuable consideration and without notice of the fraudulent influence.

Memorandum.—Bill for relief. Error to the Circuit Court of Randolph County; the Hon. BENJAMIN R. BURROUGHS, Judge, presiding. Heard in this court at the February term, 1894, and affirmed. Opinion filed June 23, 1894.

The opinion states the case.

H. Clay Horner, attorney for plaintiffs in error.

Hamill & Borders, attorneys for defendants in error.

Mr. Justice Green delivered the opinion of the Court.

Appellants averred a claim against the estate of Murphy, deceased, which was probated and allowed on April 19, 1883, in the sum of $625.57, of which $221.62, less fees, was collected and remitted July 11, 1887, by their attorney, R. P. Goddard.

On June 5, 1890, McIlwain, defendant in error, bought of them and had assigned to him for $50 the said claim, and in January, 1891, brought suit in attachment against the Murphy heirs, with the purpose of reaching by garnishment, and applying in payment of said claim, rents collected by W. R. Borders, and by a compromise settlement, after suit was commenced, made between the Murphy heirs, Borders, one Bottom, and McIlwain, judgment was entered in favor of the latter for $650, which Borders paid him. The bill in this case is not to rescind the sale of said claim, nor is any relief as against Goddard asked for, but the prayer is " that said McIlwain be required to pay to complainants the sum of $650, less $50, and proper expenses connected with the collection of said claim, and that complainants have judgment for the same, and for other and proper relief."

Plaintiffs in error claim as ground for such relief that they were induced to sell and assign the claim for less than its value, by the false and deceitful representations of McIlwain and Goddard concerning the value thereof. The representations claimed to have been so made by McIlwain were oral, and Keady, who was a clerk for plaintiffs in error at the time of the sale, but not in their employ when examined, testified on their behalf, that he and Drury, who was a member of appellant's firm made the bargain; that McIlwain brought the letter from Goddard, which witness identified and said he read; that witness asked McIlwain what he would give for the claim, and McIlwain said he could

use claim in redeeming land; that the estate was worthless; "in fact what he said was about what my record of claims showed. We settled on $50. McIlwain said estate was insolvent, and if we wished claim back we could have it after he had redeemed."

Witness also said Drury was East somewhere; that the letter from Goddard was the chief influence that led to assigning claim. McIlwain's statements had some influence, though only through the letter. McIlwain, also introduced as a witness on behalf of plaintiffs in error, testified: "I had no negotiation of any kind, manner or form with Keady in regard to buying the claim; he did not see the letter while I was there; did not purchase it from him; there was only one man I had a conversation with; purchased the claim from Drury; handed him the letter; he asked me some questions about the property, and asked me what I would give for the claim; I told him $40; he said it was worth more; I described the land to him, and told him about the crop and about the time of redemption. He asked me about the land and I told him it was a good piece of land, and I thought I could make something out of it by holding it, and if he thought there was money in it for himself, to redeem the land and not sell to me. He said we want to close the matter; we do not want the land over there; I offered him $50 for the claim, and said if he wanted to sell it to me, he would have to do it soon. He then called a clerk in, and told him to hunt up the Murphy claim and bring it to him. The clerk found it and brought it in, and he told the clerk to make an assignment of it. The young fellow did not know what to make, and I told him. The only conversation I had with Keady was with this other gentleman and I together, about the way to make the assignment; paid Drury the $50 and left." The whole evidence, if the court preferred to believe the testimony of McIlwain to that given by Keady, would justify the finding that no representations as to the value of the claim were made by McIlwain, and no such representations induced plaintiffs in error to sell, or enabled him to buy the claim.

As an evidence that he acted in good faith, and bought it, not for its intrinsic value, but for the sole purpose of redemption, it appears he did redeem from the mortgage sale, and on June 14, 1890, paid over $2,250 for that purpose, and undertook to get possession of the land by an action of forcible entry and detainer, but was met by the defense that more than seven years had expired after the claim was allowed, when he redeemed, and that case is now pending on his appeal in the Supreme Court. He took no steps to reach the rents by garnishment and thus collect the claim until some time after the purchase. It is hardly probable he would have delayed the proceeding had he known or suspected at the time he bought the claim that Borders had notes in his hands belonging to the heirs, which could be subjected to payment of claims allowed against the estate. He also testifies he had no such knowledge at that time.

The suggestion by counsel for plaintiffs in error that he might have easily acquired the knowledge by reference to certain suits touching the rents may be true, but the law does not require a purchaser to inform himself fully, in order that he may apprise his vendor of the condition or value of the property to be sold, and failing to do this, occupy a like position as if he made false representations touching the same.

The false and deceitful representations alleged to have been made by Goddard, are contained in the following letter which McIlwain delivered to Drury, and which he testified he did not read, or know the contents of until it was produced on the hearing, and which he asked Goddard to write merely for the purpose of introduction.

"SPARTA, ILL., June 4, 1890.
J. E. Hayner & Co., St. Louis, Mo.:

GENTLEMEN: This will introduce to you, James A. McIlwain, of this place, who desires to trade for your claim against the estate of Wm. Murphy, deceased, in my hands for collection. His purpose is, as he explains to me, to become a judgment creditor of the estate so as to redeem from sale of land sold by Borders & Boyle, on foreclosure mortgage

against Murphy, in his lifetime. The land, 160 acres, was sold June 13, '89, for $2,268.17, and bears eight per cent interest from that time. The land is in crop, and will go to the heirs if nothing is done to prevent. I wrote you some time ago, when I remitted thirty per cent of claim, that the estate was unsettled, and would possibly pay a small second *pro rata* dividend, on decision of matters then pending in higher court on appeal that would be determined. The litigation is now ended and the estate (or remainder) is consumed in litigation. So we can not hope to realize anything more from the estate. You will remember it (the claim) was one of the claims indorsed by George Wehrheim, of Baldwin, with whose financial condition you are as familiar as I am. So I refer Mr. McIlwain to you and write this that you may know the condition of the claim. I will add, the claim was probated April 19, 1883, in Probate Court, this county, in sum of $625.57, of which $29.78 is attorney's fees. The *pro rata* dividend paid and remitted you by me is, to wit: Collected from administrator of estate, $221.62; remitted July 11, '87, $191.85; retained fees, $29.77.

Yours truly,

R. J. GODDARD.

P. S. McIlwain is a real estate dealer and trader and wants the land and so can help us get something on the claim."

It appears from the evidence a final settlement of the Murphy estate was made in 1887, and the personal assets paid thirty per cent of the face of the probated claims and nothing remained out of which to collect the balance unpaid of the assigned claim, except rents collected and in the hands of W. R. Borders. Goddard testified that when he wrote the letter he knew nothing of rents in the hands of Borders, and was told by him in March, 1889, that he did not owe the heirs a cent of rent. That when he wrote the letter he believed nothing could be collected on the claim. Certain files of cases, appeal bonds and other record evidence, was introduced by appellants, to show that Goddard must have had notice that Borders held the rents when the letter was

written, and did not disclose such facts to plaintiffs in error. Goddard not only denied such knowledge, but explained his connection·with the litigation to be of a character that would not necessarily inform him that Borders held rents subject to the claim. It also appears there was a large amount of claims against said estate in addition to the claim introduced, at the time it was assigned, which would be entitled to a *pro rata* share of said rents, rendering it questionable whether the assigned claim would realize, over the expense of litigation, more than was paid for it.

Moreover, there was some evidence that plaintiffs in error had reports from agents as to the actual condition of the estate, which justified the belief that Goddard's letter did not induce them to sell, and to us it is apparent he had no interest in the purchase, and was not acting in collusion with McIlwain. It is said, however, on behalf of plaintiffs in error, that equity will compel restitution from third persons, that is, such as McIlwain in this case, whether innocent or not, who receive benefits through the fraud, imposition or undue influence of another. We have examined the authorities cited and find where such a rule is stated the cases are unlike this in the facts proven, and are not applicable here. In Adams' Equity, 176, one of said authorities, it is said : " Contract is not vitiated by a mere representation by the buyer of his motives in purchasing, or in limiting the amount of his offer, for these are not representations on which a man can reasonably rely." In Perry on Trusts, Sec. 211, also cited, it is said : " Property obtained by one through the fraudulent practice of a third person, will be held under a constructive trust for the person defrauded, though the person receiving the benefit is innocent of collusion." But following this it is said : " This principle, of course, can not prevail against a purchaser in good faith, for a valuable consideration, and without notice of the fraudulent influence." Our Supreme Court has held that where fraud or misrepresentation is relied on for recove y the *scienter* must be proved. Hiner v. Richter, 51 Ill. 299; Holden v. Agus, 110 Ill. 448, in which Allen v. Hart, 105, where rescission of contract was

prayed for, is commented on and explained. Endly v. Johns, 120 Ill. 468.

The further contention that, because Goddard was negligent in not ascertaining and informing plaintiffs in error that money for rents was in Borders' hands, therefore McIlwain is liable to pay over, is not tenable, nor supported by the evidence or the authorities cited. It seems also rather strange, if plaintiffs in error believed they were deceived, or defrauded, as alleged, they did not feel sufficient interest in the case to procure the deposition of Drury, the member of the firm with whom McIlwain transacted the business, or introduce him as a witness to show what representations were made by McIlwain.

A careful examination of the evidence in the record leads us to the conclusion that the trial court properly found that complainants failed to establish the material allegations of the bill, and was justified in dismissing it. The decree of the Circuit Court is affirmed.